IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

```
SOHAIL M. ABDULLA,              *
                               *
          Plaintiff,           *
                               *
     v.                        *        CV 110-159
                               *
                               *
SCOTT J. KLOSINSKI,            *
KLOSINSKI OVERSTREET, LLP,     *
and JOHNSTON, WILKIN, &        *
WILLIAMS,                      *
                               *
          Defendants.          *
                               *
```

## O R D E R

Presently pending before the Court are Defendants' joint motion to strike the testimony and opinions of Plaintiff's Rule 26(a)(2) expert (doc. no. 32) and individual motions for summary judgment (doc. nos. 33, 37). For the reasons stated below, the motion to strike is **DENIED IN PART**, but the motions for summary judgment are **GRANTED**.

## I. BACKGROUND

This legal malpractice and breach of fiduciary duty case arises out of the alleged representation of Plaintiff Sohail M. Abdulla by William J. Williams and Defendant Scott J. Klosinski. During all relevant times, Plaintiff owned and operated Sportsman's Link, Inc., a sporting and outdoor equipment store

in Augusta, Georgia.   (Abdulla Dep. at 19-21.)   The facts construed in favor of Plaintiff, the non-moving party, are as follows.

## A. The First Lawsuit by Henry's Tackle and the Origins of Representation

Sometime in 2006, a dispute arose between Sportsman's Link and one of its wholesale vendors, Henry's Tackle, LLC, over a shipment of merchandise.   (Abdulla Dep. at 64-66; see also doc. no. 37-3.)   According to Plaintiff, Henry's Tackle delivered merchandise valued at approximately $460,650.00 prematurely and out of season.   (Abdullah Dep. at 63-69.)   The delivery maxed out Sportsman's Link's credit-line with Henry's Tackle, disabling it from purchasing desired seasonal merchandise.   (Id. at 64; see also doc. no. 37-3.)   Unable to sell the out-of-season merchandise and not wanting to retain it, Plaintiff came to an agreement with Henry's Tackle whereby Sportsman's Link would review its inventory and identify items to be returned for credit; at the same time, it would pay $75,000.00 each month to Henry's Tackle until its outstanding account balance was settled.   (Doc. no. 37-5.)   Sportsman's Link sent one payment of $75,000.00 to Henry's Tackle but stopped payment on the check because Henry's Tackle did not pick up any of the merchandise marked for credit.   (Abdulla Dep. at 78-82.)   None of the merchandise at issue was ever returned to Henry's Tackle.   (Id. at 70.)

2

In December of 2006, Henry's Tackle sued Sportsman's Link and Plaintiff in the Superior Court of Richmond County to recover amounts owed on the unpaid merchandise, as well as incentives Plaintiff allegedly received for orders placed with Henry's Tackle.  (Doc. no. 37-6.)  Sportsman's Link and Plaintiff retained attorney William J. Williams, a partner with Defendant Johnston, Wilkins & Williams ("JWW"), to represent them in the case.  (Abdullah Dep. at 84.)  Williams had previously represented Sportsman's Link and Plaintiff in several other unrelated legal matters.  (Id. at 35-38.)

### B. Sportsman's Link Files for Chapter 11 Bankruptcy

Sportsman's Link's sales and profits dropped significantly in 2006, resulting in a net loss of over $200,000.00.  (Doc. 37-7; see also Abdulla Dep. at 56.)  As a result, Williams advised Plaintiff to consider the possibility of petitioning for Chapter 11 bankruptcy and directed him to Defendant Scott J. Klosinski, a partner with Defendant Klosinski Overstreet, LLP ("KO").  (Abdulla Dep. at 95-96)  After discussions with Klosinski and Williams, Plaintiff elected to file a Chapter 11 petition in March 2007. (Doc. no. 37-9.)  The suit filed by Henry's Tackle in Richmond County was consequently stayed.

### C. Henry's Tackle Moves for Either Appointment of a Trustee or Lifting of the Bankruptcy Stay

In June of 2007, Henry's Tackle filed an application for the appointment of a trustee to take over the property of

3

Sportsman's Link and operate the business (the "Trustee Motion"). (Doc. no. 37-13.) According to the Trustee Motion, Plaintiff had used Sportsman's Link "as a sham to purchase and leverage his [individual] assets" by commingling personal and corporate funds and withdrawing corporate funds for his individual benefit and to the detriment of creditors. (Id.) The Trustee Motion sought the appointment of a trustee or, in the alternative, a lifting of the bankruptcy stay to allow for a suit to pierce the corporate veil and hold Plaintiff personally liable for Sportsman's Link's debts. (Id.) Plaintiff has admitted that he personally lent money to Sportsman's Link (Abdulla Dep. at 127) and used his personal credit card to make business purchases (doc. no. 37-11 at 77-79). Sportsman's Link, in return, made payments to Plaintiff. (Abdulla Dep. at 127.) Schedules attached to Sportsman's Link's bankruptcy petition indicate that the corporation paid Plaintiff over $440,000.00 within one year of commencement of the bankruptcy case (doc. no. 37-10 at 30), but Plaintiff and Sportsman's Link's accountant both attest that Plaintiff did not use business funds for his own personal benefit. (Abdulla Dep. at 127; Leonard Dep. at 35.)

Appointment of a trustee would have ousted Plaintiff from control of Sportsman's Link's operations and could have resulted in liquidation of the corporation's assets. Hoping to avoid

4

this result, Klosinski discussed with Louis Saul, counsel for Henry's Tackle, the possibility of having the Trustee Motion withdrawn. (Klosinski Dep. at 17, 148; Saul Dep. at 26-27.) Saul indicated that the Motion would be withdrawn if a series of conditions were met, including execution of a personal guaranty from Plaintiff. (Saul Dep. at 26.) Klosinski forwarded the conditions to Plaintiff and Williams for review. (Doc. 37-14.) Sometime during this period, Klosinski advised Plaintiff that if Chapter 11 reorganization was not successful, his commingling of personal and business accounts could be considered fraudulent conveyances and form the basis for personal liability on Sportsman's Link's debts under a piercing the corporate veil claim. (Klosinski Dep. at 36.) Williams, meanwhile, was initially reluctant to have Plaintiff obligate himself on the corporation's debt, but he eventually advised Plaintiff to execute the guaranty. (Abdulla Dep. at 171-72.)

### D. Plaintiff Signs the Guaranty

On July 18, 2007, Plaintiff executed a personal guaranty of Sportsman's Link's debt in favor of Henry's Tackle in the amount of $547,219.49 (the "Guaranty").[1] (Doc. no. 37-16.) The Guaranty provides that Henry's Tackle may proceed to collect the debt from Plaintiff in the event of default, with default defined to include, *inter alia*, withdrawal of Sportsman's Link's

---

[1] The Guaranty was also signed by Plaintiff's wife, Ayesha Chowan, and Why Pay More, LLC, another business entity owned by Plaintiff and his wife.

5

Chapter 11 petition or conversion to Chapter 7.  (Id. § 2(a).)
The Guaranty further provides that "[a]ll notices, requests,
demands, directions and other communications" required under the
Guaranty and directed to Plaintiff are to be addressed to both
Klosinski and Williams.  (Id. § 15.)  Counsel for Henry's Tackle
drafted and included this provision out of concern that
Plaintiff might leave the country following execution of the
Guaranty.  (Saul Dep. at 40-41.)  Finally, the Guaranty includes
a waiver-of-defenses clause which states that it "is valid and
binding according to its terms, subject to no defense,
counterclaim, set-off or objection of any kind."  (Doc. no. 37-
16 § 8.)

### E. Sportsman's Link's Bankruptcy is Converted to Chapter 7 Proceeding, Triggering Default of the Guaranty

In June of 2008, the United States Trustee moved to convert
Sportsman's Link's bankruptcy case to a Chapter 7 proceeding
pursuant to 11 U.S.C. § 1112(b), which provides that the
Bankruptcy Court may effect a conversion if the movant
establishes a "substantial or continuing loss to or diminution
of the estate and the absence of a reasonable likelihood of
rehabilitation."  According to the Chapter 7 Motion, conversion
was merited because Sportsman's Link's post-petition operations
had significantly trended downward, resulting in a net loss and
negative cash flow.  (Doc. no. 37-17.)  Moreover, inventory had
dropped over twenty-five percent in value – evidence that the

business was surviving through the cannibalization of inventory, a process that reduces the liquidation value of the estate to the prejudice of creditors.   (Id.)   In July of 2008, the Bankruptcy Court granted the Chapter 7 Motion (Coleman Dep. at 8), and as a result the Guaranty entered default.   Plaintiff moved for reconsideration of the Chapter 7 conversion, even offering to transfer $1,000,000.00 of his personal assets to the corporation, but the motion was denied.   (Doc. no. 34-1 at 50.)

**F.  The Second Lawsuit by Henry's Tackle and Plaintiff's Default**

A month later, in August of 2008, Henry's Tackle filed suit against Plaintiff in Superior Court[2] to enforce the Guaranty. (Doc. no. 37-19.)   Per the terms of the Guaranty's notice clause, process was served by hand-delivery on Klosinski and Williams.   (Trotter Dep. at 16-17.)   Henry's Tackle also tried to serve Plaintiff personally but could not locate him.   (Id. at 17.)   Shortly before the suit was filed, Plaintiff and his wife had gone to Pakistan to stay with family.   (Abdulla Dep. at 24.) Plaintiff did not return to the United States until sometime in November 2009.   (Id. at 28.)

On August 20, 2008, Klosinski forwarded the complaint to Plaintiff by e-mail.   (Doc.  no.  37-21.)   Attached  to  the

---

[2] The suit was evidently filed in the Superior Court of Columbia County. (Doc. no. 37-19.)  However, the default judgment was issued by the Superior Court of Richmond County.   (Doc. no. 37-25.)   The parties do not dispute that the default judgment in Richmond County issued on the suit from Columbia County; therefore, while the discrepancy is noted, it will not be considered material.

complaint was a letter informing Plaintiff that KO would not be representing him in the case and advising him to contact a lawyer to defend himself "as soon as possible." (Doc. no. 37-22.) The letter further advised Plaintiff that he "should be personally served with the complaint, and . . . will have thirty (30) days from the date of service to file an answer." (Id.) On or about August 21 or 22, 2008, Plaintiff received the e-mail from Klosinski. (Abdulla Dep. at 217.) Williams did not forward the complaint to Plaintiff. (Id. at 184.)

After receiving Klosinski's e-mail in August, Plaintiff had no further contact with Klosinski, Williams, or any other attorney regarding the second Henry's Tackle lawsuit until sometime in October or early November of 2008. (Id. at 217-19.) In the meantime, the case automatically entered default because no answer was timely filed. Then, on October 30, 2008, default judgment was entered against Plaintiff and in favor of Henry's Tackle in the amount of $684,024.31, inclusive of interest and attorney's fees. (Doc. 37-19.) In October or early November of 2008, Williams and Plaintiff finally spoke about the second Henry's Tackle lawsuit, and Plaintiff requested that Williams represent him in the matter. (Abdulla Dep. at 218.) Williams agreed but requested an up-front retainer of $5,000.00, which was unusual because Williams had never previously asked for payment from Plaintiff before initiating representation. (Id.)

8

On November 4, 2008, Plaintiff's wife sent an e-mail to Williams stating that she and Plaintiff were sending a check for representation in the second Henry's Tackle lawsuit. (Doc. no. 37-27.) The retainer fee was sent to Williams between November 4 and 6. Within a week, Williams filed an answer and moved to set aside the default judgment. (Doc. nos. 37-28, 37-29.) Following a hearing, however, the state court denied the motion to set aside the default judgment and appointed a receiver to sell Plaintiff's property in satisfaction of the judgment. (Doc. no. 37-31.) Property seized by the receiver was sold at auction, netting proceeds of $412,707.24 for Henry's Tackle. (Doc. no. 37-32.)

### G. Procedural History

On December 15, 2010, Plaintiff filed the instant action in this Court[3] against Scott J. Klosinski and the Estate of William J. Williams,[4] and their respective law firms, KO and JWW, alleging legal malpractice and breach of fiduciary duties in connection with the events outlined above. KO and JWW were sued under the principle of respondeat superior.[5] Williams' estate

---

[3] To remedy certain pleading deficiencies with respect to federal subject matter jurisdiction, the Court ordered Plaintiff to file an amended complaint. (Doc. no. 65.) Plaintiff has complied (doc. no. 66), and the Court is satisfied that the parties are completely diverse and the amount in controversy exceeds $75,000. Thus, subject matter jurisdiction over the case is established pursuant to 28 U.S.C. § 1332(a)(1).

[4] Williams passed away prior to the commencement of this action.

[5] "Each partner being the agent of the firm, the firm is liable for his torts committed within the scope of his agency, on the principle of

was subsequently dismissed from the case.[6]   (Doc. no. 61.)
During discovery, both sides filed expert reports concerning the
appropriate standard of care and conducted a number of expert
depositions.   On September 21, 2011, following the close of
discovery, Defendants simultaneously moved to exclude any
testimony or opinions by Plaintiff's expert, John Freeman, and
for summary judgment.

## II. DEFENDANTS' MOTION TO STRIKE

With multiple motions pending, the first matter before the
Court is decisional sequencing.   In this regard, the Court
notes:   "To create an issue of fact concerning alleged legal
malpractice, Georgia requires the testimony of an expert
witness." Helmich v. Kentucky, 796 F.2d 1441, 1442 (11th Cir.
1986).   Accordingly, "a plaintiff may not proceed in a federal
diversity action on a legal malpractice claim under the
substantive law of Georgia without providing an affidavit or
other sworn testimony from a legal expert to support his claim."
Botes v. Weintraub, No. 1:08-CV-01341, 2010 WL 966864, at *12
(N.D. Ga. Mar. 12, 2010).   Because resolution of Defendants'

---

respondeat superior, in the same way that a master is responsible for his
servant's torts, and for the same reason (that) the firm is liable for the
torts of its agents or servants." Flynn v. Reaves, 135 Ga. App. 651, 652-53
(1975) (internal citations omitted).

[6] Because Plaintiff inadvertently included the Estate of William J.
Williams in the case caption of the amended complaint, out of an abundance of
caution, the parties filed a consent motion to drop the Estate as a party.
This consent motion (doc. no. 72) is **GRANTED**.

joint motion to strike could prove dispositive of Plaintiff's legal malpractice claims, that motion is addressed first.

Defendants have jointly moved to exclude all testimony or opinions by Plaintiff's expert, John Freeman. Freeman's opinions were first previewed by an affidavit attached to Plaintiff's complaint. Freeman later submitted a Rule 26(a)(2) report on June 14, 2011, the last day for filing per an amendment to the Court's scheduling order. The Court will refer to this report, which is attached to Defendants' motion to strike as Exhibit 2, as Freeman's "initial report." On August 14, 2011, Plaintiff filed Freeman's "supplemental report", which is attached to Defendants' motion to strike as Exhibit 7, after Defendants' experts had been deposed and eight days before the close of discovery. According to Defendants, Freeman's opinions should be excluded because his initial report is inadequate, and moreover, his supplemental report is merely a dilatory and impermissible effort to correct deficiencies in the original expert report.

Rule 26(a)(2) requires that a report, signed by the expert witness, must accompany the disclosure of each expert witness. This report must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the data or other information considered by the witness in forming them; (iii) any exhibits that will be used to

summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case. Fed. R. Civ. P. 26(a)(2)(B). A party must make these disclosures at the time and in the sequence that the court orders. Fed. R. Civ. P. 26(a)(2)(D).

Rule 37(c)(1) operates as an enforcement mechanism for Rule 26(a)(2), providing that when a "party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." Mitchell v. Ford Motor Co., 318 Fed. Appx. 821, 824 (11th Cir. 2009) (quoting Leathers v. Pfizer, Inc., 233 F.R.D. 687, 697 (N.D. Ga. 2006)).

Upon review, the Court finds that Freeman's initial report comports with Rule 26(a)(2). An expert report is deemed adequate when it is "sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated,

unnecessary depositions are avoided, and costs are reduced."
Heed v. Binder, 165 F.R.D. 424, 429 (D.N.J. 1996). The duty to
disclose expert identities and opinions set out under Rule
26(a)(2) was implemented "to accelerate the exchange of basic
information," specifically to provide "opposing parties [with] a
reasonable opportunity to prepare for effective cross
examination and perhaps arrange for expert testimony from other
witnesses." Fed. R. Civ. P. 26 advisory committee's note
(1993). The contours and demands of that duty must be
understood "in a manner to achieve those objectives." Id.

Included with exhibits and documentation concerning
Freeman's qualifications in his initial report is a three-page
affidavit – the target of Defendants' motion – roughly one-and-
a-half pages of which is devoted to articulating his opinions in
the case.[7] Freeman's affidavit, albeit short, nevertheless
satisfies the dictates of Rule 26. This being a malpractice
action, Freeman was enlisted by Plaintiff to opine on the
demands of the standard of care under the facts presented. To
that end, his affidavit states that Defendants failed to
properly "understand relevant legal documentation" or "timely .
. . convey material information." (Freeman Initial Report at 2-

---

[7] Defendants have attacked the affidavit as insufficient in part by
noting that it is identical to the affidavit attached to Plaintiff's
Complaint. Plaintiff was not, however, required to include the affidavit
with his Complaint. See Zurich Am. Ins. Co. v. Sheffer Eng'g Co., Inc., No.
1:09-CV-666, 2011 WL 344095, at *4 (N.D. Ga. Jan. 31, 2011). The point noted
by Defendants is simply immaterial.

13

3.)   Freeman also states that Defendants are culpable for
"[i]mproper handling of legal process." (Id. at 2.) These
remarks appear generic, to be sure – indeed, they would be
apropos in many, perhaps most, legal malpractice claims.
Moreover, as Defendants point out, a "brief rendition
consist[ing] primarily of legal conclusions" does not square
with Rule 26(a)(2)'s requirements. See Goodbys Creek, LLC v.
Arch Ins. Co., No. 3:07-cv-947, 2009 WL 1139575, at *2 (M.D.
Fla. Apr. 27, 2009). But "brevity alone does not result in
automatic invalidation of a report," Richman v. Sheahan, 415 F.
Supp. 2d 929, 940 n.8 (N.D. Ill. 2006), and the preceding
admonition against conclusory opinions is inapt here because the
facts upon which Freeman relied are presented alongside his
opinions in a separate exhibit.  The opinions are therefore not
presented alone and unadorned.  Compare Goodbys Creek, LLC, 2009
WL 1139575, at *2 (excluding a Rule 26 expert report because it
consisted of general statements "without disclosing *any*
underlying analysis or factual basis" (emphasis added)).
Freeman's failure to weave the facts he relied upon into his
affidavit may have caused inconvenience, but it does not offend
Rule 26(b)(2).

     Notwithstanding Defendants' charge, Freeman's initial
report is distinguishable from reports found to be defective by
other courts in this circuit.  For example, the initial report

is accompanied by documentation containing information required by Rule 26(a)(2)(B) — i.e., facts considered by the witness,[8] exhibits used to support them, the witness's qualifications, and a list of other cases in which he has participated. Compare OFS Fitel, LLC v. Epstein, Becker & Green, P.C., 549 F.3d 1344, 1362 (11th Cir. 2008) (upholding the district court's exclusion of an expert report because most of the information required under Rule 26(a)(2)(B) was "wholly absent from [the expert]'s affidavit"); Walter Int'l Prod., Inc. v. Salinas, 650 F.3d 1402, 1410 n.5 (11th Cir. 2011) (same). Freeman's initial report does not merely set out the type of opinion to be offered with a promise that such opinion will be forthcoming. Compare Sommers v. Hall, No. 4:08-CV-257, 2010 WL 3463608, at *3 (S.D. Ga. Sept. 1, 2010) (noting that a "'maybe I'll tell you someday' approach mocks the very purpose of Rule 26(a)(2)"). And, as already noted, his affidavit does not merely present unadorned conclusory opinions. Compare Goodbys Creek, LLC, 2009 WL 1139575, at *2; Romero v. Drummond Co., 552 F.3d 1303, 1323 (11th Cir. 2008) (upholding district court's exclusion of expert reports because "each report provided a single paragraph to explain the expert's anticipated opinion and the basis for it"). The issue presented here invites judicial judgment, and such

---

[8] Defendants contend that the initial report does not include the "facts or data" considered by Freeman, but his affidavit clearly states that he relied upon factual background provided by Plaintiff's counsel, and that background is set out in seventeen numbered paragraphs in a letter exhibit attached to the report. (Doc. no. 32-2 at 12-13.)

judgment must in every instance be attuned to the purposes of its exercise. Ultimately, an expert report should provide the opposing party with notice and an opportunity to prepare its case, and, in the Court's opinion, Freeman's initial report reasonably served that purpose.

Moreover, any weaknesses in Freeman's initial report did not result in discernible harm to Defendants. "The district court has broad discretion in determining whether a violation is justified or harmless." Catalina Rental Apts., Inc. v. Pacific Ins. Co., No. 06-20532-CIV, 2007 WL 1050634, at *2 (S.D. Fla. Apr. 03, 2007). "[I]n exercising its broad discretion to determine whether a [Rule 26 violation] is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." Two Men and a Truck Int'l, Inc. v. Res. & Commercial Trans. Co., No. 4:08-cv-067, 2008 WL 5235115, at *2 (N.D. Fla. Oct. 20, 2008) (quoting S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003)).

Defendants contend that they were prejudiced because they were unable to sufficiently prepare for Freeman's deposition as a result of the deficiencies plaguing Freeman's initial report. It is harmful to deprive opposing counsel of an opportunity to prepare for the deposition of an expert. Goodbys Creek, LLC, 2009 WL 1139575, at *3 ("[F]urnishing [an opposing party] with a woefully inadequate report adversely impacts upon its ability to prepare for and conduct the deposition."). Defendants' charge is not, however, supported by the record. After Freeman's initial report was served, Defendants informed Plaintiff that they believed the report to be inadequate and requested a supplement prior to the deposition – a fact tending to support Defendants' argument. But Plaintiff did not provide any substantive supplement to the initial report *prior* to Freeman's deposition,[9] yet Defendants proceeded to depose Freeman as scheduled without entreaty to this Court. This action belies a claim of prejudice. See Richman v. Sheahan, 415 F. Supp. 2d 929, 940 (N.D. Ill. 2006) ("It is inconceivable that the plaintiff would have taken the depositions of the experts . . . if she truly felt she was being or would be severely prejudiced by the reports now claimed to be deficient." (internal quotations and brackets omitted)); Poe v. Carnival Corp., No. 06-20139-CIV, 2007 WL 129007, at *3 (S.D. Fla. Jan. 15, 2007)

---

[9] Freeman's supplemental report was filed one month after he was deposed.

(noting that, notwithstanding informal requests to the opposing party, "it was still incumbent on Defendant to preserve the ability to object, should such informal methods prove fruitless, by making the appropriate motion or motions as contemplated by the rules . . . .").

Moreover, a review of Freeman's deposition shows that Defendants were able to, and did, probe his qualifications, experience, and the substance of each of his opinions. Defendants have not cited any specific examples of information they wished to obtain or extract but were unable to, nor any questions they were unable to ask. Cf. Great Northern Ins. Co. v. Ruiz, No. CV 408-194, 2011 WL 321782, at *2 (S.D. Ga. Jan. 28, 2011) (denying a motion to exclude witnesses because the moving party "provide[d] no specific examples of how the late addition of [the witnesses] would cause [it] any specific prejudice beyond presenting testimony that may be harmful to [its] case").

The bottom line is that Defendants were fairly apprised of Freeman's opinions by his initial Rule 26(a)(2) expert report. They thoroughly cross-examined him at his subsequent deposition and were able to provide expert reports of their own directly responding to his opinions. This was done prior to the close of discovery with only minimal objection from Defendants, and none filed with the Court. Defendants have presented no evidence of

18

material harm nor requested re-deposition of Freeman – an option extended by Plaintiff.[10]   (Doc. no. 48-3.)

Additionally, Defendants contend that consideration of Freeman's supplemental report, filed after Defendants' own Rule 26(a)(2) expert reports were due and before the close of discovery, is inappropriate.   Because the supplemental report includes responses to and rebuttals of facts and opinions presented during deposition testimony not available to Freeman at the time of his initial report, Defendant's argue that considering the supplemental report would, in effect, allow Plaintiff to skirt the Court's scheduling order.   See Sommers, 2010 WL 3463608, at *2 ("[Supplementation] exists to impose a duty, not to grant any right to produce information in a belated fashion." (internal quotations and brackets omitted)).   The Court will not, however, consider Freeman's supplemental report for purposes of reviewing Defendants' motions for summary judgment.   The supplemental report is unsworn, and "[u]nsworn statements do not meet the requirements of [Federal Rule of Civil Procedure] 56(e) and cannot be considered by a district court in ruling on a summary judgment motion."   Carr v.

---

[10] Defendants declined Plaintiff's invitation to re-depose Freeman because it came after the close of discovery and would have violated the Court's October 6, 2011 discovery order.   (Doc. no. 48-4.)   Despite this fact, if interested in re-deposing Freeman, Defendants could have communicated that interest with Plaintiff or the Court and sought an extension prior to the close of discovery on August 22 (eight days after the supplemental report was filed) or the civil motions deadline on September 21 (more than a month later).

Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (internal quotations omitted).

Based upon the foregoing, Defendants' motion to strike is **GRANTED IN PART** and **DENIED IN PART.** Freeman's initial report will be accepted as admissible evidence on the issues before the Court on summary judgment, but the Court will not consider Freeman's supplemental report. The Court will now turn to the merits of Plaintiff's claims.

### III. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

#### A.  Standard of Review

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp., 477 U.S. 317. Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant

21

bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given Plaintiff notice of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. nos. 38, 39.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for

filing materials in opposition has expired, and the motions are ready for consideration.

### B.  Plaintiff's Claims

Plaintiff's Complaint sets out two counts: legal malpractice and breach of fiduciary duty.  Though closely related, the two claims are not, as Defendants have urged, redundant.  A legal malpractice claim arises out of the attorney-client contract of employment.  Royal v. Harrington, 194 Ga. App. 457, 458 (1990).  A breach of fiduciary claim, on the other hand, is broader.  Fiduciary relationships include, but are not limited to, the attorney-client relationship, arising whenever "one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." Bowen v. Hunter, Maclean, Exley & Dunn, 241 Ga. App. 204, 207 (1999) (quoting O.C.G.A. § 23-2-58).  Naturally enough, because the claims are closely related the elements required to prove each are similar.  Baldly stated, for both the plaintiff must show (1) the existence of the pertinent relationship, (2) a breach of the duties attendant to that relationship, and (3) damage proximately caused by the breach.  Plaintiff's claims arise out of and will be evaluated with respect to two separate events:

his execution of the Guaranty and his default in the second Henry's Tackle lawsuit.

### 1. *The Guaranty Claims*

According to Plaintiff, Defendants committed legal malpractice and breached their fiduciary duties when they advised him to sign the Guaranty.  Before proceeding, the Court notes that because the offending conduct alleged by Plaintiff with respect to the Guaranty consists solely of the negligent performance of Defendants' professional services, the only claim stated in this regard is legal malpractice.  See Walker v. Wallis, 289 Ga. App. 676, 678 (2008) ("[C]laims for breach of fiduciary duty . . . are not based on negligence involving the performance of the professional's services."); Oehlerich v. Llewellyn, 285 Ga. App. 738, 741 (2007) (holding that when allegations of breach of fiduciary duty "clearly call into question the degree of professional skill exercised . . . [they] are duplications of . . . legal malpractice claim[s]." (internal quotation omitted)).  It is undisputed that the outstanding debt claimed by Henry's Tackle was initially owed exclusively by Sportsman's Link, not Plaintiff.  Plaintiff maintains that he would not have personally guaranteed that debt but for the advice of Defendants, advice that he contends fell below the standard of care.  The conduct of Klosinski and Williams will be reviewed in turn.

### a. *Klosinski*

Prerequisite to any legal malpractice claim is the existence of an attorney-client relationship. Crane v. Albertelli, 264 Ga. App. 910, 910 (2003). Plaintiff's claims against Klosinski fail on this account. Plaintiff does not contend that an express contract was formed between Klosinski and himself, arguing instead that the relationship may be inferred from the parties' conduct. See Huddleston v. State, 259 Ga. 45, 45 (1989) ("The relationship of attorney-client may be expressly created by written contract, or may be inferred from the conduct of the parties."). This argument, however, reads more from the facts than is reasonably permitted. "[T]he basic question in regard to formation of an attorney-client relationship is whether it has been established that advice or assistance is both sought and received in matters pertinent to his profession." Id. at 46-47. Klosinski represented Sportsman's Link, that much is settled. But the record shows that Plaintiff's claim premised upon an *individual* attorney-client relationship with Klosinski fails on both ends – that is, Plaintiff neither sought personal legal advice concerning the Guaranty from Klosinski nor received any. Nor was any fee paid for individual representation. See Mays v. Askin, 262 Ga. App. 417, 419 (2003) ("Generally, the payment of a fee is an important factor in determining the existence of an attorney-

client relationship."). "An attorney-client relationship cannot be created unilaterally in the mind of a would-be client; a reasonable belief is required." Guillebeau v. Jenkins, 182 Ga. App. 225, 231 (1987). The record in this case does not support any such belief.

Plaintiff cites a number of items from which he contends a personal attorney-client relationship may be drawn but to no avail. First is a retainer agreement signed by Plaintiff to employ KO, among others, as legal counsel for both he and Sportsman's Link in a tenancy dispute *separate and apart* from the bankruptcy case. (Doc. no. 56-7.) "The scope of an attorney's authority when retained to prosecute or defend a pending case is determined by the terms of his contract of employment . . . ." Dean v. Jackson, 219 Ga. 552, 552 (1964). Here, the retainer cited by Plaintiff belies his allegation for it specifically provides that representation shall be for "the case of Sportsman's Link, Inc. (Sohail Abdulla) vs. U.S. Properties Group (and/or affiliated entities), Walmart, Sam's Club, or under such other name as this cause of action may become known." (Doc. no. 56-7.) The retainer expressly delimited representation, and it therefore offers no aid to Plaintiff's claim. See Jerry Lipps, Inc. v. Postell, 139 Ga. App. 595, 595 (1976) ("The relationship of attorney and client is fiduciary in character, but this does not extend beyond the

subject matter for which the services of the lawyer have been retained."). Next, Plaintiff points to references evidently made by Klosinski to opposing counsel on two occasions indicating that Plaintiff was his client. But the formation of an attorney-client relationship turns on "a 'reasonable belief' on the part *of the would-be client*," Calhoun v. Tapley, 196 Ga. App. 318, 319 (1990) (emphasis added), not the representations of a lawyer to third parties.[11] This argument also misses the mark.

Plaintiff next relies on Klosinski's role in the negotiation of the Guaranty for undergirding. After the Trustee Motion was filed, Klosinski engaged in preliminary negotiations with Louis Saul (Klosinski Dep. at 17, 31), the attorney for Henry's Tackle, and forwarded the terms of Saul's demand for a personal guaranty to Plaintiff (doc. no. 34-1). This conduct is not inconsistent, however, with Klosinski's undisputed role as counsel for Sportsman's Link. The Trustee Motion was filed in Sportsman's Link's Chapter 11 bankruptcy case and sought to either appoint a trustee to assume control of the corporation's assets and operation or to lift the bankruptcy stay to pursue a claim against it. It is only natural, then, that Klosinski, as the corporation's attorney, would discuss the possibility of withdrawing the Trustee Motion with counsel for the moving

---

[11] The Court further notes that the alleged third-party references cited by Plaintiff were made a year *after* the Guaranty was signed. (See Doc. no. 56 at 16.)

party.  But after forwarding Saul's proposed terms of withdrawal
to Plaintiff, including the demand for a personal guaranty, the
evidence shows that Klosinski had no further involvement in the
Guaranty negotiations (Saul Dep. at 35; Klosinski Dep. at 20-
21), and by Plaintiff's own admission, Klosinski offered no
advice regarding its execution (Abdulla Dep. at 278-79).

Lastly, Plaintiff points to statements made by Klosinski
regarding the advisability of filing a Chapter 11 bankruptcy for
Sportsman's Link and the possibility that Plaintiff might be
vulnerable to personal liability for fraudulent conveyances in
the event such bankruptcy proved unsuccessful.  Plaintiff
enlisted Klosinski's services on behalf of Sportsman's Link to
represent the corporation in its bankruptcy case.  Accordingly,
Klosinski's statements to Plaintiff, owner and operator of
Sportsman's Link, on the advisability of corporate bankruptcy
proceedings and the possible consequences of their failure are
part and parcel of that representation.  They did not sow the
seeds of an individual attorney-client relationship.  "One who
serves as attorney for a corporation does not, by virtue of that
fact, serve as attorney for the officers of the corporation in
their personal capacity . . . for the corporation possesses a
legal existence separate and apart from that of its officers
individually."  Addley v. Beizer, 205 Ga. App. 714, 715 (1992).
The line separating the affairs of an individual and those of

28

his closely-held corporation can be a fine and murky one, but the record is empty of evidence showing that Klosinski as corporate counsel made any representations in the breach.

There being insufficient evidence to support a finding that Klosinski represented Plaintiff in his individual capacity when the Guaranty was signed, Klosinski and KO's motion for summary judgment on Plaintiff's legal malpractice claim as to the Guaranty is **GRANTED**.

### b. Williams

Unlike Klosinski, JWW does not dispute that Williams personally represented Plaintiff when he signed the Guaranty. Instead, JWW contends that Williams's advice did not fall outside the bounds of ordinary prudence. The Court agrees.

It is uncontested that Williams did in fact advise Plaintiff to execute the Guaranty. The question is whether a reasonable juror could find that Williams breached the standard of ordinary care in doing so. The dictates of this duty "are not authoritatively formulated anywhere as though they were prescriptions in a pharmacopoeia." Malinski v. New York, 324 U.S. 401, 417 (1945) (Frankfurter, J., concurring). They are instead tailored to setting. An attorney must act as a reasonably prudent attorney would under the same circumstances, and such action must be judged against those circumstances rather than its results. See Hill Aircraft & Leasing Corp. v.

29

Tyler, 161 Ga. App. 267, 273 (1982) ("The operative question on the issue of the required degree of care and skill of the attorney is whether or not such attorney exercised a reasonable degree of care and skill under the circumstances.").

The polished lens of hindsight makes easy play of counterfactuals so caution must be taken to guard against its prejudices. This precept animates the doctrine of judgmental immunity, adopted by Georgia courts and explained in the following terms:

> [T]here can be no liability for acts and omissions by an attorney in the conduct of litigation which are based on an honest exercise of professional judgment. This is a sound rule. Otherwise every losing litigant would be able to sue his attorney if he could find another attorney who was willing to second guess the decisions of the first attorney with the advantage of hindsight.

Mosera v. Davis, 306 Ga. App. 226, 232 (2010).

The doctrine was instructively applied in Mosera, a case bearing many similarities to the instant action. The plaintiff in Mosera filed a notice of lis pendens against property involved in an underlying real estate action. He later settled with the opposing parties in that action, agreeing in part to release the lis pendens in exchange for a deed to secure debt on the property. He further agreed, however, not to file the deed unless the settlement was breached without cure. The property was later encumbered by another lien and, following default of the settlement and foreclosure on the property, Plaintiff's

30

security interest was extinguished because it had not been filed. The plaintiff sued the attorneys involved in negotiating his settlement, but the Georgia Court of Appeals affirmed the trial court's grant of summary judgment to the attorneys. The court reasoned that the plaintiff was a well-educated businessman who had read the settlement agreement, and, moreover, he had been advised of the risk associated with his promise not to file the deed to secure debt. Id. at 232. On these facts, the court held that the attorneys were shielded from liability under the judgmental immunity doctrine. Id.

No conflict of interest is alleged here, and, as shown by Mosera, courts are otherwise loathe to pierce the honest judgment of an attorney made during negotiations. There is no evidence germane to the Guaranty showing misrepresentation, procedural missteps, or plain legal error. Rather Plaintiff, a sophisticated businessman with prior bankruptcy and guaranty experience,[12] complains that Williams's advice was wanting and wrongheaded. Freeman, Plaintiff's expert, has opined that Williams failed to properly assess and communicate to Plaintiff the risks presented by the Trustee Motion and the Guaranty. (Freeman Dep. at 41, 54, 70-71, 77-80.) But Plaintiff has

---

[12] Plaintiff owned and operated Sportsman's Link since 1998. (Abdulla Dep. at 19.) Prior to opening Sportsman's Link, he owned and operated a franchise restaurant location for thirteen years (id. at 13) and another sporting goods store for approximately six years (id. at 14). He has engaged in business sales (id. at 17, 19) and acquisitions (id. at 14). He has also created several corporations (id. at 33-34), been through a prior bankruptcy reorganization (id. at 97-99), and personally guaranteed corporate debt on at least one other occasion (id. at 120).

acknowledged that he read the Guaranty, assessed the viability of a piercing the corporate veil claim, and understood that by executing the Guaranty he would become personally liable.[13] (Abdulla Dep. at 168-77, 189.) Moreover, Plaintiff wanted strongly to retain control of the corporation's operation, a fact later evidenced by his personal pledge of $1,000,00.00 in personal assets to void the Chapter 7 conversion (doc. no. 34-1 at 50), and there is no question that the Trustee Motion threatened that control (see Freeman Dep. at 48). Notwithstanding Plaintiff's claim to the contrary, the record shows that Plaintiff was apprised of the risks presented by the Trustee Motion as well as the personal interests served by, and consequences of, the Guaranty's execution.

In an effort to demonstrate the errancy of Williams's advice, Plaintiff contends that the piercing the corporate veil action by which Henry's Tackle sought to hold Plaintiff personally liable could not have succeeded because Sportsman's Link was not insolvent. Plaintiff therefore faced zero prospect of personal liability outside of the personal Guaranty, the argument continues, and Williams's advice to execute the

---

[13] To illustrate, Plaintiff stated at his deposition:

- "I'm sure I read [the Guaranty.]" (Id. at 189.)
- "I understood that Henry [sic] wanted to [pierce the corporate veil], but I didn't think in a cold day in you know what they're going to get that." (Id. at 176.)
- "Why would I sign a guarantee? [sic] I have nothing. Why would I agree to something – why would I not just – why would I agree not just to pay them, why would I agree to pay them almost $100,000 more than they're owed?" (Id. at 168.)

Guaranty is irrational in that light. It is true that in Georgia, "as a precondition to a plaintiff's piercing the corporate veil and holding individual shareholders liable on a corporate claim, . . . there [must] be insolvency on the part of the corporation." Johnson v. Lipton, 254 Ga. 326, 327 (1985). Moreover, the Bankruptcy Court concluded that Sportsman's Link was not insolvent at the time its petition was filed in March 2007. (Doc. no. 56-4 at 21.) That Court's order also notes, however, that Sportman's Link's "balance sheet shows that it was solvent until sometime in 2007." (Id. at 4). According to the very order upon which Plaintiff relies, then, Sportsman's Link became insolvent within a matter of months after the Trustee Motion requesting leave to file a piercing the corporate veil claim was filed in June 2007. Failure of that claim is thus hardly the legal certainty which Plaintiff asserts. But putting the possibility of this claim aside, the Bankruptcy Court could have granted the Trustee Motion and appointed a trustee to assume control of the corporation's assets and operation *even if* it elected not to lift the stay and allow the proposed action. See 11 U.S.C. § 1104(a). Indeed, in July of 2008, little more than a year after the Trustee Motion was filed, it did precisely that by converting the bankruptcy case from Chapter 11 to Chapter 7. (Coleman Dep. at 8.)

Attorneys are not insurers of their clients' fortunes. Williams advised Plaintiff to execute the Guaranty, but "an attorney [is] not liable for a mere error of judgment, when he consults his client, and the latter, after being informed of the legal status of the case, approves the course the attorney proposes to pursue." Leighton v. New York, S. & W.R. Co., 303 F. Supp. 599, 618 (S.D.N.Y. 1969). The Trustee Motion presented Plaintiff with the risks of losing operational control of Sportsman's Link and personal liability, and those risks were not merely fanciful, as Plaintiff's history of financial commingling and the Bankruptcy Court's eventual conversion to Chapter 7 demonstrate. Like the plaintiff in Mosera, Plaintiff is an experienced businessman who read the terms of the Guaranty, and his initial reluctance to sign it shows that he understood the personal obligation it entailed. Ultimately, "when determining whether to settle a dispute, it is the client, not the attorney, who bears the risk. Because the client bears the risk, it is the client who should assess whether the risk is acceptable, not the attorney." Wood v. McGrath, North, Mullin & Kratz, P.C., 256 Neb. 109, 117 (1999) (citing 2 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 17.15 (4th ed. 1996)). With all of this as backdrop, no reasonable person could conclude that Williams's advice to sign the Guaranty breached the duty of ordinary care.

34

Although it is undisputed that Williams represented
Plaintiff individually and advised him to sign the Guaranty, the
record does not support an inference that Williams's exercise of
good faith judgment violated his duty of ordinary care under the
circumstances. JWW's motion for summary judgment as to the
Guaranty claim is **GRANTED**.

### 2. The Second Henry's Tackle Lawsuit Claims

Moving on from Plaintiff's claims relating to the Guaranty,
Plaintiff also asserts that Defendants breached their
obligations with respect to the second Henry's Tackle lawsuit
filed in August 2008. Plaintiff maintains that both Williams
and Klosinski represented him at the time of service and
therefore had a duty to consult with him and file an answer in
the case on his behalf. Alternatively, Plaintiff has alleged
that Defendants breached their fiduciary duties as registered
service agents.[14] Defendants deny owing Plaintiff any fiduciary
duties, and furthermore, contend that Plaintiff cannot establish

---

[14] Paying heed to Federal Rule of Civil Procedure 8(e)'s admonition that
"[p]leadings must be construed so as to do justice," the Court has taken some
modest liberties in construing the allegations set out in Plaintiff's
complaint. As already noted, Plaintiff alleges two counts: legal malpractice
and breach of fiduciary duty. Each cause of action incorporates the same
facts and recites nearly identical allegations. Unlike the legal malpractice
claim in Count One, however, Count Two's breach of fiduciary claim may lie
even in the absence of an attorney-client relationship, and Plaintiff alleged
that Defendants were registered service agents (Compl. ¶ 14), i.e.,
fiduciaries, that failed to properly handle service of the second Henry's
lawsuit (id. ¶ 35c). The Complaint thus states a claim for breach of
fiduciary duty relating to Defendants' role as registered service agents.
See Sams v. United Food & Commercial Workers Int'l Union, 866 F.2d 1380, 1384
(11th Cir. 1989) ("A complaint need not specify in detail the precise theory
giving rise to recovery. All that is required is that the defendant be on
notice as to the claim being asserted against him and the grounds on which it
rests.").

35

proximate causation of damages even in the event of wrongdoing. The Court agrees to the latter; therefore, the merits of Plaintiff's claims aside, Defendants are entitled to summary judgment.

"A claim for legal malpractice is sui generis insofar as the plaintiff's proof of damages effectively requires proof that he would have prevailed in the original litigation but for the act of the attorney charged with malpractice." Paul v. Smith, Gambrell & Russell, 283 Ga. App. 584, 587 (2007). Plaintiff's claims relating to the second Henry's Tackle lawsuit arise out of enforcement of the Guaranty against him; therefore, the viability of his claims at bar turns on the defenses he could have raised against enforcement. The Guaranty contains a waiver-of-defenses clause which provides, in relevant part: "this Guaranty is valid and binding according to its terms, subject to no defense, counterclaim, set-off or objection of any kind. . . ." (Doc. no. 37-16 § 8.) By its plain terms, the clause precludes any defense that Plaintiff could have mustered to avoid successful enforcement of the Guaranty against him. Plaintiff nevertheless maintains that several defenses were available and could have, if timely invoked, prevailed against enforcement of the Guaranty – namely, lack of consideration, duress, and unconscionability. Upon review, the Court concludes that each fails as a matter of law.

36

### a. Lack of Consideration

Plaintiff's first asserted defense to the Guaranty's enforcement is lack of consideration. The bargain embodied in the Guaranty consists of Plaintiff's having personally guaranteed Sportsman's Link's debt in exchange for withdrawal of the Trustee Motion. According to Plaintiff, withdrawal of the Trustee Motion does not qualify as consideration because the Motion was not made in good faith; moreover, the benefits of withdrawal accrued solely to Sportsman's Link, not to Plaintiff personally, and it therefore cannot be enforced against him. These contentions are meritless.

Forbearance and compromise qualify as consideration. O.C.G.A. § 13-3-42(c)(2). "Not only forbearance to litigate, but also the relinquishment of any other right, or forbearance to do any act which one has a legal right to do, is consideration where such forbearance is requested as consideration. In short, forbearance to do something which one is legally entitled to do, of almost any character, will be sufficient . . . ." 3 Williston on Contracts § 7:45 (4th ed.); see also Wolfe v. Breman, 69 Ga. App. 813 (1943) ("Forbearance to prosecute a legal claim, and the compromise of a doubtful right, are both sufficient considerations to support a contract." (quoted source omitted)). That said, "while the law recognizes that the compromise of a doubtful claim will support

a[n] agreement, that claim *must be asserted in good faith*."
Matrix Fin. Serv., Inc. v. Dean, 288 Ga. App. 666, 668 (2007)
(emphasis added). Plaintiff points to this qualification for
support. According to Plaintiff, there were no reasonable
grounds to support filing of the Trustee Motion and, as a
consequence, its withdrawal cannot constitute legal
consideration. See id. at 669 ("Although the courts will not
inquire into the validity of a claim which was compromised in
good faith, there must generally be reasonable grounds for a
belief in order for the court to be convinced that the belief
was honestly entertained by the person who asserted it.").
However, this contention is simply inaccurate.

The circumstances surrounding the Trustee Motion have
already been discussed at length; suffice it to say at this
point that the Trustee Motion sought, among other things, the
appointment of a trustee to assume control of Sportsman's Link
under 11 U.S.C. § 1104(a). This statute provides for the
appointment of a trustee "for cause, including fraud,
dishonesty, incompetence, or gross mismanagement of the affairs
of the debtor . . .;" or alternatively, "if such appointment is
in the interests of creditors . . . ." Id. § 1104(a)(1)-(2).
The catalogue of Plaintiff's personal transfers in and out of
the corporation is long, and the corporation's financial
situation was quickly deteriorating when the Trustee Motion was

38

filed. These constitute "reasonable grounds" to assert a motion for appointment under the plain terms of § 1104(a)(1)-(2). Finally, the fact that withdrawal of the Trustee Motion did not directly benefit Plaintiff personally as he was not a party to the bankruptcy action provides no rescue to his argument. It is axiomatic that "[c]onsideration need not be a benefit accruing to the promisor, but may be a benefit accruing to another." Fisher v. Toombs Cnty. Nursing Home, 223 Ga. App. 842, 845 (1996); see also O.C.G.A. § 13-3-42(d). Based on the above, the Guaranty represented a well-considered bargain, and Plaintiff's defense to the contrary is misguided.

> b. *Duress*

Plaintiff's second proffered defense is that the Guaranty is void due to duress. "Since the free assent of the parties is essential to a valid contract, duress, either by imprisonment, threats, or other acts, by which the free will of the party is restrained and his consent induced, renders the contract voidable at the election of the injured party." O.C.G.A. § 13-5-6. The defense of duress sets a very high hurdle for those seeking its refuge – it requires no less than a showing of conduct "amounting to coercion, or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." Mallen v. Mallen, 280 Ga. 43, 46 (2005).

The duress in this case does not concern any physical harm or threats, consisting instead of what is commonly referred to as "economic duress." "Business compulsion or economic duress involves the taking of undue or unjust advantage of a person's economic necessity or distress to coerce him into making a contract . . . ." Hampton Island, LLC v. HAOP, LLC, 306 Ga. App. 542, 544 (2010). Though recognized as a valid defense, "Georgia courts are reluctant to void contracts, and [there is] no Georgia decision voiding a contract on the theory of economic duress." Id. at 545. "[H]ard bargaining, by itself, cannot support a duress defense. One may not void a contract on the grounds of duress merely because he entered into it with reluctance, the contract was very disadvantageous to him, the bargaining power of the parties was unequal, or there was some unfairness in the negotiations preceding the agreement." Id. at 546. Counsel for Henry's Tackle may have been shrewd in filing the Trustee Motion and negotiating the terms of the Guaranty, but there is no foul in cunning. In any event, "when the signer of an agreement is sophisticated in business matters and has access to and in fact obtains advice of counsel, the defense of duress is not available to void the contract." Id. at 545 (emphasis omitted). Because the facts presented fall squarely within parameters of this caveat, the purported defense of duress fails.

c. *Unconscionability*

With his third and final proposed defense to the Guaranty, Plaintiff resorts to equity, arguing that the terms of the Guaranty are unconscionable. "An unconscionable contract is one abhorrent to good morals and conscience . . . where one of the parties takes a fraudulent advantage of another[,] an agreement that no sane person not acting under a delusion would make and that no honest person would take advantage of." Mallen, 280 Ga. at 47 (internal quotations omitted). "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract . . . ." O.C.G.A. § 11-2-302(1).[15]  This defense, like the previous two, does not hold up.

The Guaranty went through several iterations (Abdulla Dep. at 187), Plaintiff read its final terms (id. at 189), and discussed it with counsel. "Competent parties are free to choose, insert, and agree to whatever provisions they desire in a contract . . . unless prohibited by statute or public policy." Brookside Communities, LLC v. Lake Dow N. Corp., 268 Ga. App. 785, 786 (2004). Plaintiff cites no relevant statute to bar the Guaranty's enforcement nor does public policy in Georgia void it. To the contrary, a limitation of remedies is not considered

---

[15] The quoted statute falls under Uniform Commercial Code Article 2 concerning the sale of goods. The Guaranty obviously does not concern the sale of goods; however, in Georgia there is no noticeable difference in the standards and procedures for unconscionability in and out of the Article 2 context. Garbutt v. S. Clays, Inc., 894 F. Supp. 456, 463 (M.D. Ga. 1995).

unconscionable.  Hall v. Fruehauf Corp., 179 Ga. App. 362, 362
(1986).    Indeed,  waiver-of-defenses  clauses  similar  to  that
present in this case have been repeatedly enforced in Georgia.
See, e.g., Brookside Communities, LLC, 268 Ga. App. at 786;
Ramirez v. Golden, 223 Ga. App. 610, 611 (1996).  "[A] guarantor
may  consent  in  advance  to  a  course  of  conduct  which  would
otherwise  result  in  his  discharge  .  .  .  [and]  this  includes
waiving  defenses  which  otherwise  would  be  available  to  a
guarantor."   Ramirez, 223 Ga. App. at 611 (citation omitted).
One-sided  though  the  Guaranty  may  appear  now,  with  Plaintiff
seeking to avoid over $600,000.00 in personal liability imposed
thereunder,  its  terms  do  not  range  past  the  broad  bounds  of  sane
judgment.    From  Plaintiff's  standpoint  the  terms  are  severe,
yes; unwise, perhaps; unconscionable, no.

        In  sum,  Plaintiff's  claims  relating  to  the  second  Henry's
Tackle lawsuit lack a basis to infer proximately caused damages.
Plaintiff signed the Guaranty and thereby personally obligated
himself on Sportsman's Link's corporate debt and, at the same
time,  waived  all  defenses  to  the  Guaranty's  enforcement.
Plaintiff now regrets that decision, but the defenses he raises
to  personal  liability  are  meritless.    As  a  consequence,  he
cannot  show  that  any  alleged  misconduct  by  Defendants,  even  if
it occurred, proximately caused him injury.  The Guaranty would
have  been  enforced  against  him  on  its  own  terms,  if  not  by

42

default judgment. For that reason, Defendants motion for to summary judgment as to these claims is **GRANTED**.

### 3. Punitive Damages and Attorneys' Fees

In his complaint, Plaintiff prayed for punitive damages and attorneys' fees. Neither may be granted, however, in the absence of a valid claim. <u>Dowdell v. Krystal Co.</u>, 291 Ga. App. 469, 473 (2008). In any event, Plaintiff has withdrawn his request (doc. no. 34-1 at 63-64), and thus Defendants' motions for summary judgment as to these additional damages are **GRANTED**.

### IV. CONCLUSION

Based upon the foregoing, Defendants' joint motion to strike (doc. no. 32) is **DENIED IN PART**. Nevertheless, after careful review, Defendants' motions for summary judgment (doc. nos. 33, 37) are hereby **GRANTED**. Finally, the parties' consent motion to dismiss the Estate of William J. Williams from the action (doc. no. 72) is **GRANTED.** The Clerk is **DIRECTED** to **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this 25th day of September, 2012.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA